UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANTHONY JONES,

        Petitioner,

    v.

WARDEN, KERN VALLEY STATE PRISON

        Respondent.

No.  2:14-cv-00486 JAM GGH

<u>FINDINGS AND RECOMMENDATIONS</u>

*Introduction and Summary*

      Petitioner is serving a life sentence with the possibility of parole plus ten years[1] for being a felon in possession of a firearm, attempted carjacking and kidnapping for robbery with the enhancement that a firearm was used in the commission of the carjacking and kidnapping crimes. Three issues are raised, Claim 4 having been previously dismissed by the court:[2]

    1.  Failure to substitute counsel when petitioner expressed dissatisfaction with his trial counsel "forcing" petitioner to then represent himself;

---

[1] Petitioner was originally sentenced to 50 years to life plus 25 years.  However, this sentence was remanded and fixed as set forth above according to the first amended petition.  The sentencing proceedings do not play a part in this habeas proceeding.
[2] Claim 4 involved an allegation that petitioner's trial counsel had improperly given information to the district attorney.

1

2. Violating petitioner's right to compulsory process;

3. Failing to appoint counsel when the trial court expressed a doubt as to petitioner's competence to continue with his criminal proceedings, and failing to suspend such proceedings because of such incompetence.

For the reasons set forth below, the first two claims should be denied, but with no judgment entered as of yet; the habeas proceeding should then be stayed so that petitioner may exhaust his incompetency claim with the new evidence available.

*Background Facts*

Normally, the undersigned would set forth a comprehensive background of the facts leading to the criminal convictions either by adopting the discussion of the Court of Appeal, or otherwise by a synthesis of the record.  However, none of the above issues depend on such a comprehensive explication.  Therefore, the undersigned will dispense with a detailed factual discussion.[3]  The facts necessary for review of each issue will be set forth with the discussion of each issue.

*Discussion*

A. <u>AEDPA Standards</u>

All of petitioner's claims were decided on the merits by the state courts, including the

---

[3] However, the synopsized, beginning paragraphs of the Court of Appeal opinion are set forth here as they accurately sum up the crimes committed:

> We strongly discourage anyone from choosing crime as a career. Nevertheless, as with any pursuit in life, one should be prepared. For instance, if you are planning to carjack someone, you should make sure you can drive a stick-shift.

> Defendant Anthony Jones and an accomplice tried to take Garrett Freitas's car at gun point. The duo were apparently unaware that starting a manual transmission vehicle requires depression of the clutch pedal. Unable to start the car, defendant turned the gun on Freitas and ordered him to drive, converting what would have been a straightforward carjacking into attempted carjacking and kidnapping for purposes of robbery. About half a mile away, defendant told Freitas to pull over and call someone who had drugs or he 'wouldn't be going home.' Police arrived . . . .

<u>People v. Jones</u>, 2012 WL 3860801 (Cal. App. 2012).

2

1 California Supreme Court; therefore the AEDPA standards are in full play.

2      The statutory limitations of federal courts' power to issue habeas corpus relief for persons

3 in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

4 Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, ––– U.S. ––– —, ––––, 132 S. Ct. 38, 44 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405–06, 120 S. Ct. 1495 (2000)).  Circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, ––– U.S. ––––, ––––, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, ––– U.S. ––––, ––––, 132 S. Ct. 2148, 2155 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

3

case.[4] Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a ''firm conviction'' that the state court was ''erroneous.''").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101, 131 S. Ct. 770 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004)).[5] Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

---

[4] The undersigned also finds that the same deference is paid to the factual determinations of state courts.  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).  It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination.  A petitioner must show clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct. 969, 974 (2006).

[5] "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Harrington, 562 U.S. at 101 (citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000)).

1   "[Section] 2254(d) does not require a state court to give reasons before its decision can be

2   deemed to have been 'adjudicated on the merits.'"  Harrington, 562 U.S. at 100.  Rather, "[w]hen

3   a federal claim has been presented to a state court and the state court has denied relief, it may be

4   presumed that the state court adjudicated the claim on the merits in the absence of any indication

5   or state-law procedural principles to the contrary."  Id. at 784-85.  This presumption may be

6   overcome by a showing "there is reason to think some other explanation for the state court's

7   decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct.

8   2590 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

9   but does not expressly address a federal claim, a federal habeas court must presume, subject to

10   rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___

11   –, ___, 133 S. Ct. 1088, 1091 (2013).

12        When it is clear, however, that a state court has not reached the merits of a petitioner's

13   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

14   habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

15   F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

16        The state courts need not have cited to federal authority, or even have indicated awareness

17   of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362,

18   365 (2002).  Where the state court reaches a decision on the merits but provides no reasoning to

19   support its conclusion, a federal habeas court independently reviews the record to determine

20   whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

21   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

22   review of the constitutional issue, but rather, the only method by which we can determine whether

23   a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

24   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

25   reasonable basis for the state court to deny relief."  Harrington, 562 U.S. at 98.

26        A summary denial is presumed to be a denial on the merits of the petitioner's claims.

27   Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

28   just what the state court did when it issued a summary denial, the federal court must review the

5

state court record to determine whether there was any "reasonable basis for the state court to deny relief." Harrington, 562 U.S. at 98.  This court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 786.  "Evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003)).

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Harrington, 562 U.S. at 98).

B.  Substitution of Counsel

Cases with nearly impossible merits facts for a defendant sometimes breed desperate measures by that defendant.  Such appears to be the case here.  The evidence against petitioner was indeed overwhelming; during the course of his criminal proceedings, petitioner made *five* Marsden motions (substitution of counsel).[6]  The Court of Appeal performed a lengthy analysis of each motion.  Although lengthy, the discussion is set forth in its entirety for completeness.

> On May 5, 2009, prior to the preliminary hearing, defendant moved to replace Foster as his attorney, stating: "I just feel that I cannot trust him because he is basically lying to me. If he is my lawyer, he is supposed to be my lawyer. He is supposed to have my best interest at hand. He should be able to tell me the truth about anything concerning this case, and he is not doing it. He is not telling me the truth." As an example of Foster's alleged deceit, defendant claimed that Foster told him on one occasion that he had spoken to the prosecutor and on another occasion denied having spoken to the prosecutor. Defendant also claimed that Foster lied

---

[6] People v. Marsden, 2 Cal. 3d 118 (1970).

while advising him not to file a civil suit against the arresting officers for excessive force, explaining: "He says you might be giving them some evidence that they don't have. So, two or three times later when he comes to see me, I asked him again because I already see the contradictions. . . . He says well, the background, when they get it, they might feel you don't have a civil case. Then what is the [District Attorney] going to say? I said see, that is not what you told me the last time, you know? It is like every time he comes to see me it is a different story, you know."

In response to defendant's complaints, Foster explained that he advised defendant that he did not believe a civil suit against the officers would be successful because a jury would likely believe the officers used reasonable force to apprehend defendant in light of the fact that defendant was armed with a handgun and fleeing from the officers when he was shot. Nevertheless, Foster provided defendant with copies of relevant sections of a treatise on police misconduct. He also provided defendant with a claim form, advised defendant of the six-month filing deadline, and took independent pictures of the scene and defendant's injuries. Foster told defendant that if he chose to file a civil suit, he should wait until the last possible moment because of the prospect of civil discovery occurring during the middle of the criminal trial. Foster also suggested that such a lawsuit might be a bargaining chip in settlement negotiations with the prosecution. Foster further stated that he had no intention of deceiving defendant.

The trial court denied the Marsden motion, explaining: "First of all, to the extent that there are any conflicts between [defendant] and [Foster], I find in favor of [Foster]. I have no doubt of his veracity and the recounting of facts of this case. Further, I find that [Foster] has properly represented [defendant] and will continue to do so. I further find that there has not been a breakdown in the relationship such that [Foster] cannot and would not properly continue to aggressively represent [defendant]." After denying the motion, the trial court addressed defendant: "I could ask fifty panel lawyers to come over here in an attempt to replace [Foster]. Not one of them would exceed [Foster]'s skill or competence. You have no idea how fortunate you are to have [Foster] represent you. I encourage you to ask around. He is one of the best lawyers in this county. You could not do better. I understand you are having some difficulty understanding and communicating with him, but you are extremely lucky to have him as your lawyer."

2.     Second Marsden Motion

On September 28, 2009, defendant filed a written Marsden motion. Defendant complained that he and Foster would "constantly argue" about the facts of the case, the defense strategy, and whether or not defendant should file a civil suit against the arresting officers, adding: "I have actually cursed [Foster] out on several occasions."

In response, Foster acknowledged that he and defendant had

7

argued, not about the facts of the case, but about the legal consequences of those facts. The largest point of contention was whether or not defendant had a viable claim against the arresting officers for excessive force. Foster explained: "And I did tell him that I didn't believe that a jury would award him any money based on the fact that he was an armed fleeing felon who had the—the officers had probable cause to believe had just committed an armed robbery and an armed carjacking, and had he been allowed to—and their efforts with helicopter and dog and officers and voice commands for some period of time to ask him to come out of the shed, his refusal to do so, and when he did then bolt out of the shed and run from officers heading towards the fence, which had he been able to clear it and get out into the neighborhood would have been an armed felon loose in the neighborhood." Nevertheless, as already mentioned, Foster provided defendant with "probably 40 pages" out of a treatise on police misconduct and told defendant that "perhaps the District Attorney's Office would be willing to bundle his civil claim and his criminal case and resolve it in a manner that was beneficial to [defendant]." However, the District Attorney's office "never indicated any willingness to do so," and issued a letter to the Sheriff's Department finding that the shooting was lawful.

Defendant also claimed that Foster "told [him] on several occasions to basically lay down and accept whatever the Prosecution is going to do in this case." Foster responded: "I think the term I used is sometimes you are caught with your hand in the cookie jar. And my advice to [defendant] was not to lay down, but there [were] some charges that we had room to argue on and there were some charges that we did not have room to argue on. [¶] And the fact that property was taken from [Freitas] by force is a pretty clear evidence of a robbery, and the fact that [Freitas] was taken about a half- mile in his vehicle by force is also pretty strong evidence of a kidnapping, and that—but there was plenty of room to argue that this was not a kidnap for robbery, but rather a kidnap for chauffeuring. . . . [¶] . . . There is a significant difference between a simple kidnapping charge carrying a maximum of eight years versus kidnapping for robbery, which carries life. Based on the facts as I saw them, that was the best viable defense."

Defendant also asserted that Foster was "placed on the case in order to set [him] up." In connection with this assertion, defendant claimed that when Foster replaced a previous panel attorney, Renwick, who was initially assigned to his case, Foster told defendant that Renwick did not have enough experience to handle the case. Defendant did not believe this was the actual reason because Renwick told him that he had 30 years experience. In response, Foster denied that he was assigned to the case in order to "set up" defendant and stated that he did not know the reason he was assigned to take over the case from Renwick except that there are minimum experience requirements in order to handle certain cases. The trial court found no evidence that Foster was assigned the case to set up defendant and added: "I will point out to you, I don't know what [Renwick]'s experience is, but the experience that [Foster] has of a hundred jury trials, roughly a hundred jury trials and been practicing since 1985, that is the kind of experience that

8

most people would give their right arm to have as their defense counsel."

Defendant also claimed that Foster was "railroading" him by stating in an in limine motion that "Freitas would not be asked to attempt to identify [defendant] in court as one of the individuals of the attack," and that there would be "no mention of the lawfulness of the shooting." When the trial court asked defendant why he would want the jury to hear that the shooting was found to be lawful, defendant replied: "Why not? It's not hurting my case. What I'm saying is this, right? It's not hurting my defense. It's not hurting anything. Why would he not want this mentioned?"

With respect to the issue of identification, Foster explained that, while Freitas did not conclusively identify defendant at the preliminary hearing, he did state that defendant "fit the size and build" of one of the assailants. Foster also explained: "[W]hatever play we can get with [Freitas's] ability to identify or not identify [defendant] is—it would be a [Pyrrhic] victory at most. While there may be some inability, the fact of the matter is, there is an officer who saw him run from the car who identified him. He's on videotape leaving the car in clothing that is found on him a short distance away, a couple of hours away, hiding in somebody's shed." This evidence, coupled with the fact that Rentie would also testify that defendant was the one who pulled the gun on Freitas, caused Foster to believe that "the identity issue [was] very, very weak." Thus, Foster concluded that it would be better to have Freitas leave the stand without attempting to identify defendant than to add what would likely be a partial identification to the other identifications the prosecution would be able to proffer. The trial court explained to defendant that "the defense counsel is the captain of the ship, he or she is the person who has to make the tactical decisions."

Also on the identification issue, defendant complained that Foster had moved in limine to exclude the police in-car camera footage, calling that decision "mind boggling." Foster responded: "What can be seen on the in-car camera is an individual who matches [defendant's] clothing description . . . getting out of the car, walking away from the officer's commands and then running from the scene. So while the screen that I saw [was] not detailed enough to be able to see the face of the individual who got out of the car, the clothing is clearly discernible and it matches both the descriptions of clothing by witnesses and also the clothing that [defendant] had on him when he was apprehended." The trial court commented that Foster's attempt to keep this piece of evidence away from the jury was a strategic decision and amounted to "good lawyering." Defendant responded: "To me, it's not."

Defendant also accused Foster of "feeding the Prosecution [his] defense secrets." As defendant explained this accusation: "Foster's defense was to admit to kidnapping and try to fight kidnapping for robbery. Since I refused to take that route, [Foster] alerted the Prosecution, I believe, who then gave my co-defendant a deal to testify against me a couple days before trial started." Foster responded: "I have not done that. In fact, as I searched for issues in

this case, the potentially winnable issues that I see, number one, are [sic ] that it was not kidnap for robbery as we discussed, and number two, the prior convictions out of New York do not qualify as strikes under California law. [¶] Neither of—the first issue was discussed openly at preliminary hearing when I was asking the Court not to hold [defendant] to answer. The second has not been discussed with the Prosecution at all." Foster also explained that the reason the District Attorney decided to give Rentie a deal in exchange for his testimony against defendant was that Freitas had made some "racially derogatory remarks" on a social networking website that could damage his credibility. When asked whether he wanted to respond, defendant stated that he could not prove Foster had divulged defense secrets without the trial court's "assistance."

Defendant also complained that Foster refused to file a Pitchess motion. [footnote omitted.] Foster responded that he did not believe the facts of defendant's case warranted the filing of such a motion. The trial court pointed out that this was a strategic decision and stated: "I don't see anything from what you've presented here that says that he has made a poor strategic decision."

Defendant further complained that Foster had not given him all of his discovery and tried to keep him "in the blind about crucial information." Foster responded that except for a recorded interview of Deputy McAtee, the officer who shot defendant, and the in-car camera footage, defendant had seen all of the discovery. With respect to the in-car camera footage, there were some technical difficulties that prevented the footage from playing on Foster's computer. Foster and the District Attorney were working on a solution to the problem. With respect to the recorded interview, the audio on the DVD was not clear and defendant declined Foster's offer to play for him the separate audio recording of the interview.

Defendant also complained that Foster "refused to approach the [District Attorney] about possible plea negotiations after saying that he would once [defendant's] New York priors came back to show that [defendant] suffered no strikes." Foster explained that the District Attorney was not interested in any sort of plea arrangement with defendant.

Defendant further complained that Foster advised him to waive his right to a speedy trial because of "the massive backup of cases" in the trial court. Foster responded that he had never seen a serious felony case dismissed because the trial court had a backlog of cases. The trial court agreed. Finally, defendant asserted that Foster and the prosecutor who was originally assigned to the case, Timothy Carr, had "secret dealings" when they either "met or planned to meet" outside his presence. Foster denied this allegation.

At the conclusion of the hearing, the trial court asked Foster whether his relationship with defendant had so deteriorated that he did not feel he could provide adequate representation as a criminal defense attorney. Foster responded: "No." The trial court asked whether Foster was willing to continue to represent defendant and give his best efforts in doing so. Foster responded: "Yes." The trial

court then denied the Marsden motion.

Following denial of the *Marsden* motion, defendant moved under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562] (*Faretta* ) to represent himself. However, when the trial court questioned defendant concerning his *Faretta* motion, defendant stated: "I don't see how I can prepare for a defense." The trial court agreed and advised defendant: "I don't see how you can possibly prepare for a defense of this case.   You need a lawyer, sir." Defendant responded: "You're right."  Nevertheless, defendant reasserted his decision to represent himself, stating: "I would rather represent myself and get multiple life terms than have [Foster] represent me, period." Over defendant's objection, the trial court postponed the matter until the following day to give defendant an opportunity to reconsider his decision and attempt to work things out with Foster. Defendant responded: "I'm not talking to this man ever again, period."

The following day, the trial court asked defendant whether he had changed his mind about representing himself. Defendant asked to revisit the *Marsden* issue. The trial court declined the request and began to question defendant to ensure he understood the consequences of representing himself. Defendant answered that he did not care whether he understood and then refused to answer any more questions. After a short recess, the trial court reconvened the hearing on the *Marsden* motion. The trial court then asked defendant whether anything new had happened that he believed would entitle him to have Foster replaced. Defendant refused to respond.  The trial court again denied the *Marsden* motion. Returning to the *Faretta* motion, defendant still refused to answer questions, which made it impossible for the trial court to determine whether his request to represent himself was unequivocal, knowing, and intelligent. Accordingly, the *Faretta* motion was denied.

3.     Third Marsden Motion

The following day, defendant again moved to replace Foster as his attorney, stating that certain boxes that were checked on the written *Marsden* motion were not discussed during the previous hearing. While the trial court believed that matter had been fully litigated, it nevertheless allowed defendant to address each checked box.

The first box (a) stated: "Counsel has failed and/or refused to confer with declarant concerning the preparation of declarant's defense." Addressing this contention, defendant acknowledged that Foster had conferred with him concerning the preparation of the defense by complaining that he and Foster argued over the defense strategy. And when the trial court commented that defendant was the one who was refusing to speak to Foster, defendant admitted that he had recently refused to speak to Foster. Foster added that he had conferred with defendant "12 or 13 times" concerning the preparation of the defense before defendant refused to see him. The trial court ruled: "I do not find that counsel's failed or has refused to confer with the declarant. I think quite to the contrary. It seems to be the other way around."

11

The second box (b) stated: "Counsel has failed and/or refused to communicate with declarant." Addressing this contention, defendant stated: "B's answered since A is answered." The trial court agreed. Defendant then complained about the substance of the communication: "[T]he communication that we're talking about, you know, is him just telling me to lay down, just lay down; you know, I'm going to argue that it wasn't a kidnap for robbery. [¶] Other than that, lay down, that's the communication, period, and argue that you didn't suffer any prior strikes. That's it." As this argument was fully addressed in the previous hearing, the trial court moved on to the next issue.

The third box (c) stated: "Counsel has failed and/or refused to subpoena witnesses favorable to the defense and deprived declarant of the testimony critical to the defense." Addressing this contention, defendant explained that while the police were searching the neighborhood following his flight from the Tercel, a trained police dog "alerted" to a nearby residence. A background check on a vehicle parked in front of the residence came back to a man with "Antonio" as his middle name. At the time, officers believed this could be a possible match for the suspect. Defendant complained that Foster did not subpoena this individual and anyone else who lived at the residence. However, as Foster explained, this individual was Hispanic while the victim and his girlfriend identified the assailants as African–American. Moreover, defendant was found a short time later in a shed wearing the same clothes that were seen on the person fleeing from the Tercel. And the following day, while at the hospital, defendant admitted to police that he was the one who ran from the vehicle. The trial court found that Foster made a rational decision not to subpoena this individual.

The fourth box (d) stated: "Counsel has failed and/or refused to perform and/or to have performed investigation(s) critical and necessary to the defense." The trial court asked defendant: "Other than what you have just previously stated regarding that house, is there anything else he's refused to do?" Defendant responded: "I can't even think right now, so I don't know." The trial court found no basis for concluding that Foster had failed to adequately investigate the case and moved on to the next issue.

The fifth box (g) stated: "Counsel has failed and/or refused to prepare and file motion(s) critical to the defense." Addressing this contention, defendant repeated his assertion that Foster should have filed a *Pitchess* motion, and also argued that Foster should have moved to suppress the identifications made by Rentie and Sergeant Turner. The trial court declined to readdress the *Pitchess* motion, except to say that filing such a motion would have been "inappropriate" or "extraneous." With respect to the motions to suppress, Foster stated: "I don't know the legal basis upon which [defendant] suggests that either [Rentie's] identification of him or Sergeant Turner's identification of him could be suppressed." The trial court ruled that Foster's decision not to bring these motions was rational and pointed out that "there is no requirement of the defense counsel to bring irrational motions or motions based on irrational beliefs or unsupportable beliefs."

The sixth box (h) stated: "Counsel has failed and/or refused to impeach prosecution witness(es)." Addressing this contention, defendant complained that Foster did not impeach Freitas or Sergeant Turner at the preliminary hearing. Foster responded that he cross-examined both individuals at the preliminary hearing and explained that defendant had not mentioned anything else that he believed should have been used to impeach these witnesses. Defendant then explained that he wanted Sergeant Turner impeached because Sergeant Turner "lied on the stand" when he claimed that he did not know immediately who fired the shot after defendant ran from the shed. Foster told defendant that he wanted to save that for trial. The trial court responded: "It seems to me that if I'm convinced that the preliminary hearing is going to end up with a holding order, why would I fire all my—my ammunition at the preliminary hearing? [¶] I'd save some for trial. [¶] Is that essentially the way this worked out . . . ." Foster answered: "Yes." The trial court found this to be a "reasonable defense strategy" and not a "refusal to impeach a prosecution witness at a preliminary hearing." With respect to Freitas, defendant complained that Foster did not further impeach this witness after he stated at the preliminary hearing that he could not identify defendant as one of the assailants. Foster responded: "Well, if he's complaining that the witness—the victim didn't identify him and then I left it alone, I'm not sure that's an appropriate complaint." The trial court asked whether that made sense to defendant. Defendant answered: "I mean, everything else is getting shut down. Just shut down that, too."

The seventh box (j) stated: "Counsel has failed and/or refused to declare prejudice and/or conflict against declarant." Foster responded: "I have no legal conflict and I have no level of prejudice against [defendant] that would make it difficult or impossible for me to perform my duties in his defense." The trial court found no evidence of prejudice or conflict sufficient to grant the motion on these grounds.

The final box (k), which was handwritten, stated: "Counsel has failed and/or refused to furnish declarant with all of the discovery needed in order to defend himself; Counsel has been giving the prosecution information about the declarant's defense on several occasions." Addressing this contention, defendant claimed to have new evidence that Foster had supplied defense secrets to the prosecution, specifically that he witnessed Foster "constantly" sending text messages to the prosecutor, Carr, but did not know what was in these text messages. Defendant asked for all e-mail and text messages exchanged between Foster and Carr. Foster denied sharing defense secrets with the prosecution. He also denied sending any text messages to Carr, but admitted that he had sent e-mails over his cell phone, which may have looked like text messages to defendant. Foster offered to share all such e-mails with defendant. Foster also offered to share other items of discovery that he recently received, but defendant refused to meet with him at the jail. Defendant further complained that he had not received copies of the "roughly 400" crime scene photos and was missing five pages from Deputy McAtee's interview. Foster agreed to look into

13

these missing pages for defendant. Foster also agreed to provide defendant with copies of all crime scene photos that were not duplicative.

The trial court denied the *Marsden* motion, stating: "I think we have now [discussed] everything that we can possibly discuss from the items that you've prepared and filed on September 28th. [¶] And with that, I find that there [are] no grounds for—for the granting of a *Marsden* motion."

4.      Fourth Marsden Motion

On November 10, 2009, defendant again moved to replace Foster as his attorney. This time, defendant complained about a particular e-mail exchange between Foster and Carr in which defendant claimed Foster violated the attorney-client privilege. The first e-mail is from Foster explaining that he was having technical problems viewing the in-car camera footage, which apparently had been sent to him as a video file. Carr responded that he would try to get a "ready-made" copy of the footage to Foster and also offered to allow him to view the video file at the District Attorney's office. Foster responded: "[T]hanks for the offer. [T]he one I'm primarily interested in is the camera at the scene of the initial traffic stop *where my guy flees on foot*. [H]ave you looked at that one yet?" Carr responded: "[Y]eah I watched it . . . you can see the red jacket, quality is not good enough for a definitive ID. You can see him get out, start backing away, and then take off." (Italics added.)

Defendant complained about the italicized portion of Foster's e-mail, explaining: "He is speaking to the Prosecution letting the Prosecution know that I did—that I did this crime." Defendant further argued: "After [Foster] tells him that that was me, now all of a sudden, since they see that they can't see me on camera, now they switch their tactics. Timothy Carr gets off the case. The district attorneys switch their tactics and give my co-defendant a deal."

In response, Foster explained that prior to the e-mail exchange, Carr told him that defendant could be seen in the video fleeing from the car, referring to defendant as "your guy." Foster had not seen the video because of technical problems and simply stated, using the same terminology as Carr, that he was interested in seeing the video purportedly showing "my guy," i.e., defendant, fleeing from the car. This was not meant to be taken as an admission that defendant was actually the one depicted in the video. Foster further explained: "I did not disclose to [Carr], I did not disclose to [Liske, the prosecutor who replaced Carr on the case], I did not disclose to anybody else outside of the privileged circle of confidence that only [defendant] and I share, things that [defendant] has told me. I don't do that. I didn't do that in this case. I am not working for the [District Attorney]. I am trying to do the best I can for [defendant]." Foster also explained that Carr "was involved in another jury trial when this case was first sent out to trial, and by necessity, the District Attorney's Office had to hand this case off to another prosecutor to handle the trial. That explains [Liske]'s involvement in the case, not, as far as I know, any efforts by anybody to remove

[Carr] for any sort of impropriety."

The trial court accepted Foster's explanation, found no violation of the attorney-client privilege, and denied the *Marsden* motion. Foster then stated that his relationship with defendant had not so deteriorated that he would not be able to provide an adequate defense. Defendant responded: "I'm going to file charges against [Foster]. [¶] . . . [¶] What I'm telling you is a conflict of interest, this man cannot be my attorney if I'm going to file charges against him." The trial court confirmed its ruling denying the *Marsden* motion.

Defendant then renewed his *Faretta* motion. The trial court advised defendant of the consequences and dangers of representing himself and elicited responses from defendant indicating that he was literate, fully understood these consequences, and nevertheless wanted to represent himself. The trial court granted the motion.

On December 28, 2009, during a hearing on a motion to suppress evidence, defendant told the trial court: "Well, I'm objecting to everything that you have done ever since I have been pro per, and I'm asking right now for counsel." The trial court reappointed Foster over defendant's objection.

5.      Fifth Marsden Motion

On February 2, 2010, defendant again moved to replace Foster as his attorney. Defendant argued that Foster had not provided him with all of the e-mails and text messages exchanged with Carr. Foster responded that he had given defendant all such e-mails and that there were no such text messages. Defendant also stated that he and Foster had "no relationship whatsoever" and argued that Foster did not "want to fight for [him]." Defendant further complained that Foster did not "fix" the *Pitchess* motion defendant filed while representing himself.

The trial court denied the *Marsden* motion, explaining that it believed Foster had provided defendant with all the e-mails exchanged with Carr. With respect to the other complaints, the trial court stated that it would not entertain "the same issues over and over again." Following denial of the *Marsden* motion, defendant again moved to represent himself. The trial court again advised defendant of the consequences and dangers of representing himself and again granted the motion allowing him to do so.

People v. Jones, 2012 WL 3860801 (Cal. App. 2012).

Respondent argues that no Supreme Court case has held that the assertedly erroneous denial of a motion to substitute counsel based on a conflict between a defendant and attorney states a federal claim in habeas. For the reasons that follow, at least in the circumstances of this case, respondent is correct. In any event, even if such a federal claim has been authorized, on

point, en banc, Ninth Circuit precedent in an AEDPA context finds such a claim unmeritorious.

However, a distinct, but related, claim encompassed within the substitution of counsel dispute, understandably unaddressed by respondent, and in fairness unaddressed by the California courts despite the issue having been raised,[7] is whether the disputes with counsel tainted petitioner's "voluntary" request to represent himself, i.e., the <u>Faretta</u> waiver.  There is no doubt that an asserted lack of voluntariness in the waiver of counsel states a federal claim.  <u>McCormick v. Adams</u>, 621 F.3d 970, 976 (9th Cir. 2008).  As discussed in footnote 7, this issue will be addressed <i>infra</i>.

The analytical difficulty commences with the case of <u>Schell v. Witek</u>, 218 F.3d 1017 (9th Cir. 2000) (en banc), a non-AEDPA case.  <u>Schell</u> held that "[t]he denial without a hearing on a motion to substitute counsel based on allegations of an 'irreconcilable conflict' implicates the defendant's Sixth Amendment right to counsel."  <u>Id.</u> at 1023.  However, the case continued, relying on prior Circuit precedent, to find that permitting a defendant to undergo trial with a

_____

[7] The federal petition herein does not raise a <u>Faretta</u> claim (<u>Faretta v. California</u>, 422 U.S. 806 (1975)).  Nevertheless, the precise issue of the "taint" of the voluntariness of the waiver of counsel occasioned by the assertedly erroneous denial of the motions to substitute counsel was expressly set forth in the Petition for Review at 6, and previously in the Court of Appeal appellant's brief at 49.  Thus, the claim is exhausted; however, in fairness to the state courts, the issue was never separately raised from the substitution of counsel issue and was certainly not highlighted.  The procedural issue here is what to do with this separate, but related claim.

The circumstances here are different than was the case in <u>Robinson v. Kramer</u>, 588 F.3d 1212 (9th Cir. 2009).  Robinson had not exhausted his <u>Faretta</u> claim, nor had he in any way raised such a claim in his federal petition, but for the first time it was referenced was on appeal.  Thus, the undersigned faces a no-win situation.  Respondent can assert that the undersigned has become petitioner's attorney for recognizing a <u>Faretta</u> claim when no such claim has been formally presented, thus far, in the federal petition.  The undersigned is sensitive to his role as a <i>neutral</i> adjudicator who should not become an advocate for one party.  On the other hand, because the issue has been exhausted, later assessments of the undersigned's work can criticize the failure to recognize the liberality of review of <i>pro se</i> pleadings.  Moreover, if petitioner did raise this claim on objections, the most likely outcome would be its remand to the undersigned to "start over" and assess this claim as a magistrate judge's determination that a claim has not been raised is often an evaporative finding.  Even if this claim were not raised until appeal to the Ninth Circuit, the undersigned's decision not to review the <u>Faretta</u> claim might well be determined to be in error as appellate justices do not speak with one voice on a court's duty to assist <i>pro se</i> petitioners.

In sum, the undersigned will risk the sting of respondent's criticism rather than the potential for a "do over" because the undersigned was too stingy in recognizing a potential claim.  The issue will be discussed in the text.

counsel with whom the defendant had an irreconcilable conflict was to deprive the defendant of any counsel whatsoever.  Id at 1025.  Two seminal Supreme Court cases generally dealing with the right to counsel *per se* for trial and appeal were cited for this proposition along with Circuit precedent.  Id.[8]  Despite Schell being a non-AEDPA case, and despite the lack of Supreme Court authority specifically establishing the "irreconcilable conflict" rule, AEDPA cases following Schell adopted such a rule for their AEDPA holdings.  See, e.g., Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007).

Nevertheless, the Ninth Circuit in Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2007) (en banc) significantly cut back the applicability of Schell to AEDPA cases.  Distinguishing Schell as a case involving the substitution issue without any hearing whatsoever, Plumlee at 1211, and defining the "conflict" one had with his attorney requiring substitution as an actual conflict of interest as traditionally defined, id. at 1210,[9] the Ninth Circuit went on to hold:

> Plumlee has cited no Supreme Court case—and we are not aware of any—that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust.

Id. at 1211.

Citing Supreme Court cases for the proposition that a defendant is entitled to counsel who "'function[s] in the active role of an advocate,'" Plumlee went on to find that counsel in its case had not ceased to be an advocate, or at least that the state court was not unreasonable in finding such, id at 1211, simply because the defendant had an "irreconcilable conflict," id. at1205, with his counsel.  Like the case here, defendant's subjective distrust of his attorney in Plumlee reached the point where the defendant was "compelled" to represent himself rather than continue with counsel.

Petitioner's case is indistinguishable from Plumlee as described in the entirety of the analysis of the Court of Appeal set forth at length above.  It is clear that petitioner did not trust his

---

[8] Gideon v. Wainwright, 372 U.S. 335 (1963) (trial); Entsminger v. Iowa, 386 U.S. 748 (1967) (appeal).
[9] That is, the attorney was encumbered with an interest adverse to that of his client.

1    attorney for many subjective reasons, e.g., the attorney was perceived by petitioner as conspiring

2    with the district attorney or "selling out;" petitioner and his counsel disagreed on tactics to the

3    point where petitioner believed that his counsel was not advocating for him, e.g., refusal to

4    impeach witnesses at a preliminary hearing, refusal to file a civil suit for police misconduct

5    during the pendency of the criminal action.  Nevertheless, the trial judge patiently heard petitioner

6    out every time and found no objective basis for his mistrust of counsel.

7         Accordingly, either, as <u>Plumlee</u> found, no Supreme Court case recognizes a federal claim

8    in the circumstances presented, or in the alternative, fairminded jurists would not believe that the

9    state courts had unreasonably determined the substitution issue assuming the existence of a

10   federal claim.

11        This brings the discussion to the <u>Faretta</u> issue.[10]  It is clearly established that the waiver of

12   one's right to counsel is clearly established, and that the desire to represent oneself must be

13   unequivocally expressed.  <u>McCormick</u>, *supra*.  As set forth in footnote 7, the analysis here is

14   related, but distinct from the substitution of counsel issue.  But, it must be emphasized that a

15   defendant should not be allowed to consciously or unconsciously manipulate the system.  That is,

16   an expressed antipathy to counsel, which does not justify a substitution of counsel, cannot give

17   the then self-represented defendant an unassailable trump card card to play on appeal claiming

18   that he never wanted to represent himself after all, but that he was "compelled" to do so.

19        Petitioner made no claim in the state courts, nor in the federal petition, that he was not

20   advised properly by the court about the pitfalls of self-representation.  Nor is the issue here that

21   petitioner was not permitted to represent himself.  Rather the entire issue, indeed if the

22   undersigned has correctly determined that an issue exists at all, is the voluntariness of the waiver.

23   A waiver of the right to representation by counsel must be knowingly *and* voluntarily given;

24   <u>Stetson v. Lambert</u>, 504 F3d 873, 882 (9th Cir. 2007).

25   _____

[10] The correct standard of review is a difficult issue for the <u>Faretta</u> issue.  The state courts never
26   directly responded to petitioner's statement within the larger substitution issue that the antipathy
     between petitioner and counsel had tainted the <u>Faretta</u> issue.  In order for the AEDPA standard to
27   apply, the undersigned would have to determine that the state courts had silently ruled on the
     merits of this issue.  However, no lengthy procedural analysis need be performed here—the result
28   does not differ whether the AEDPA standard applies or whether the issue is reviewed *de novo*.

1    The issue here is resolved by <u>Arrendoddo v. Neven</u>, 763 F.3d 1122 (9th Cir. 2013).  In

2    this case, the defendant, like petitioner here, stated his desire to represent himself, but only

3    because he thought his present counsel incompetent.  He stated to the court that he was being

4    compelled to represent himself because of this alleged incompetence—"I have no other choice

5    apparently."  <u>Id.</u> at 1127.

> A defendant's waiver of counsel must not only be knowing and intelligent, it must also be voluntary. *See Faretta*, 422 U.S. at 835, 95 S. Ct. 2525; *Patterson*, 487 U.S. at 292 n.4, 108 S. Ct. 2389. Arrendondo argues that his decision to forego representation, even if knowing and intelligent, was not voluntary, "because he was forced to choose between incompetent, unprepared, and ineffective counsel versus self-representation." Arrendondo's argument fails on the facts, as he has not established that his trial counsel was constitutionally inadequate. We therefore need not, and do not, consider whether his legal theory, if supported by the facts, would entitle him to relief.
>
> When unconstrained by 28 U.S.C. § 2254(d)(1), our cases do indicate that a *Faretta* waiver is involuntary if the alternative is constitutionally inadequate counsel. *See Crandell v. Bunnell*, 25 F.3d 754, 755 (9th Cir. 1994) (per curiam); *United States v. Robinson*, 913 F.2d 712, 715–16 (9th Cir. 1990). Electing self representation over unsatisfactory—but constitutionally sufficient—counsel does not make a defendant's waiver of counsel involuntary. *See Robinson*, 913 F.2d at 715–16. Even if Supreme Court law has clearly established this standard—and we do not decide whether it has—Arrendondo has not factually satisfied it.

18   <u>Arrendondo</u>, 763 F3d at 1136-37.

19    Every single of-record assertion by petitioner of his counsel's alleged ineffectiveness was

20   reviewed by the trial judge.  Under any standard of review, the undersigned finds the trial judge,

21   and the Court of Appeal, to be correct in finding that defense counsel was not

22   ineffective/incompetent.  Petitioner advances no other assertions of ineffectiveness in this

23   petition, even assuming he has raised the issue of <u>Faretta</u> voluntariness herein.  Under any level of

24   review by the undersigned of a *pro se* petition, the undersigned is not required to *sua sponte* comb

25   the record on petitioner's behalf to raise and adjudicate additional, arguable ineffectiveness

26   issues, as if the undersigned were both petitioner's lawyer and judge.

27    Accordingly, the entire substitution of counsel/<u>Faretta</u> issue should be denied.

28   C.  <u>Denial of Compulsory Process</u>

19

Petitioner committed his crimes with the help of a co-assailant, by name of Rentie.  At some point before petitioner's trial, Rentie struck a plea agreement with the prosecution in pertinent part requiring Rentie to testify truthfully if he was called as a witness.  Being called as a witness was not limited in the agreement to being called by the prosecution.  It appears that Rentie had not been sentenced prior to petitioner's trial, but such delays when a co-defendant's case is pending trial are not unusual.  In any event, Rentie believed that he was still facing jeopardy when called by petitioner in his case, and being advised by his attorney, Rentie indicated that he would invoke his Fifth Amendment rights.  The court refused to require the prosecution to immunize Rentie's testimony, and Rentie did not testify.

According to the state habeas petition, petitioner believes that calling Rentie would have been useful because the carjacking/kidnapping victim in petitioner's case refused to acknowledge on the witness stand that he knew Rentie as a friend.  Other than potential, collateral impeachment of the victim/witness, the undersigned is unsure how this knowledge of the victim would have aided petitioner's case as he does not explain such, i.e., there is no substantive rule that friends of a co-assailant  cannot be carjacked or kidnapped.[11]

The issue was not brought before the Court of Appeal—only in the state habeas petition which was summarily denied; thus, there is no explained opinion denying the claim.

The Ninth Circuit has long held that the Due Process Clause may require the court to order a grant of immunity in certain limited situations.  United States v. Wilkes, 744 F.3d 1101; Williams v. Woodsford, 384 F.3d 567, 599-600 (9th Cir. 2002).  However, as observed by respondent, citing Graves v. Swarthout, 471 Fed. Appx 768 (9th Cir. 2012), the Supreme Court has never expressly adopted such a rule.  Neither the independent research by the undersigned, nor petitioner's, demonstrates that the Graves unpublished observation is incorrect.

Such is the death knell of a claim controlled by AEDPA.  Petitioner's compulsory process claim should be denied.

---

[11] The victim, Garrett Freitas, had his own problems with the criminal justice system, but there is no allegation that petitioner could not obtain such information from the victim, either on direct or cross-examination.

1    D. Incompetence to Stand Trial Claim

2         This claim required the undersigned to request supplemental briefing in that the trial judge

3    *sua sponte* and *ex parte*, during trial, asked medical personnel in the Sacramento County Jail to

4    opine on petitioner's mental/emotional status.  The claim is further complicated in that a very

5    pertinent record was not available to the Court of Appeal on review of this claim on direct appeal.

6         The entire history pertinent to this claim is as follows.  Early on during the proceedings,

7    the trial judge hearing pre-trial matters expressed his view that he had no doubt about petitioner's

8    competence to proceed to trial.  The comment was made against the backdrop of a back-and-forth

9    concerning petitioner's mental capacity at the time of the crime.  For whatever reason, the trial

10   judge initially believed competency to stand trial might be at issue:

11            The Court: [the trial judge was characterizing a motion
             petitioner had made]
12            I'm also making a motion to the Court to look into the
             mental capacity of defendant based on the fact that the defendant
13           does suffer from a mental illness and possibly did not have the
             capacity to commit or even appreciate the criminality of his
14           conduct.
             Defendant will move to argue that he cannot in any way
15           conform his conduct to the requirements of law.
             That's what was written.
16           So, we'll look at that from a competency point of view.
             I—Anthony Jones, I asked you if you prepared this
17           handwritten document.  You said you did.
             You also indicated yesterday or the day before that you had
18           prepared the other document, the other Marsden motion, and you
             filled out the Faretta paperwork and you argued that yourself.
19           You have made a number of arguments to the court over the
             last three days, and the—the farthest thing from my mind at this
20           point is that you're incompetent to stand trial, that you have been
             arguing vociferously and quite competently a number of motions.
21           What am I missing, Sir?
                                        ***
22           I said you were competent—you were competent enough to
             write these documents.  You were competent enough to argue these
23           matters.
             Now you're saying that you don't believe you're competent
24           to stand trial?
             Let me ask defense counsel.
25           Is it your view that Mr. Jones is incompetent to stand trial?
             Mr. Foster: I am not raising a competency issue as to this
26           client in this case.
             The Court: So—
27           The Defendant [petitioner]: I believe what the motion states
             is that I'm making a motion to the Court to look into the mental
28           capacity of defendant based on the fact the defendant does suffer

21

from mental illness.
>The Court: I've seen absolutely no indication whatsoever to show that you are—to show that you are incompetent to stand trial.

RT 195-97.

Thus, it is clear that the trial judge maintained no doubt as to petitioner's capacity several months prior to trial. This statement was also made in the context of petitioner's numerous attempts to represent himself. As often occurs however, when a petitioner represents himself at trial, conflict, confusion, surliness, and acting out arises because the petitioner does not like or understand the rulings of the court.

On February 25, 2010, just prior to trial, the Clerk's record indicates a "Court ordered inmate [cell] extraction":

>Judge Davidian has been advised that you have been medically cleared to attend court.
>You are hereby ordered to appear in Department 37. . . . Be advised that your refusal to comply with this order will be an element to be considered in the Court's determination whether or not to terminate your right to represent yourself under the Faretta ruling.

CT 374 (petitioner had apparently been suffering from declared cold and or flu symptoms).

On several, even numerous occasions, this conflict between petitioner and those in authority exasperated an otherwise very patient judge. See, e.g., RT 985-86 (warning petitioner what would happen should he engage in further disruptive behavior); RT 1070-86.

Just a few days prior to the receipt of the mental examination at issue here, petitioner was again refusing to go to court because he thought himself physically ill. CT 394. However, there appears to be nothing in the record a few days later on Thursday March 4, (outside episodes of the "normal" conflict between petitioner and the court) which precipitated the giving of the psychological exam to petitioner, the result of which was reported the next court day, Monday March 8. Nor were there any advisements in the record that such a psychological exam had been requested; petitioner certainly had not been so advised. Apparently, the prosecution had not been advised either. The court record shows on March 8:

>Prior to the commencement of trial, this morning a Vernessa Lauria (an administrative assistant & custodian of records at the main jail) delivered a confidential jail psychologist report, and

informed Judge Davidian the specifics related to the report, in camera. The court directed the clerk to file and seal said report to maintain confidentiality. According to contents of said report, the court found defendant Jones may continue with this trial.

CT 401.[12]

In assessing this issue of petitioner's competence on direct review, the Court of Appeal determined:

Nevertheless, defendant contends the following events reveal that the trial court entertained a doubt as to his competence to stand trial. The day after the prosecution began its case, a staff psychologist at the county jail examined defendant pursuant to section 4011.6. This section provides in pertinent part: "In any case in which it appears to the person in charge of a county jail, city jail, or juvenile detention facility, or to any judge of a court in the county in which the jail or juvenile detention facility is located, that a person in custody in that jail or juvenile detention facility may be mentally disordered, he or she may cause the prisoner to be taken to a facility for 72–hour treatment and evaluation pursuant to Section 5150 of the Welfare and Institutions Code 3 and he or she shall inform the facility in writing, which shall be confidential, of the reasons that the person is being taken to the facility." (§ 4011.6.) The staff psychologist who examined defendant determined that defendant "[d]id not meet [Welfare and Institutions Code section] 5150 criteria at this time." When the trial court was informed of this evaluation, the court stated: "Let me put on the record very quickly that I have received clearance from medical personnel at the jail that we are ready to proceed, that there is no reason not to proceed."

Defendant argues that the trial court's "choice of words indicates that, prior to receiving the report, it had entertained a doubt about whether [defendant] had the mental capacity to proceed." And because section 1367.1 provides that a misdemeanor defendant may be referred for evaluation and treatment under section 4011.6 if the court concludes there is reason to believe the defendant is mentally disordered and may be incompetent to stand trial, defendant argues that it "seems evident the trial court used section 1367.1 to determine whether [defendant] was able to proceed with trial and self-represent." From this, defendant concludes that the trial court erred in employing section 1367.1, pointing out that this provision applies only in misdemeanor cases.

Defendant's premise is flawed. There is nothing in the record to suggest that the trial court ordered the section 4011.6 evaluation to

[12] At the start of the court day, the court made this cryptic statement before the parties: "Let me put on the record very quickly that I have received clearance from medical personnel at the jail that we are ready to proceed, that there is no reason not to proceed.  That will be entered in the record, and let's go ahead and call your witness."  RT 1251-52.  Neither the prosecution nor the defendant had made a comment on this statement.

1
2
3
4
5
6
7

> alleviate a doubt as to defendant's competence to stand trial. Indeed, there is nothing in the record indicating that the trial court ordered the evaluation. It is entirely possible that the "person in charge of [the] county jail" (§ 4011.6) ordered the evaluation because he or she had probable cause to believe that defendant was, "as a result of mental disorder, a danger to others, or to himself or herself, or gravely disabled." (Welf. & Inst. Code, § 5150.) "[A] conclusion that a defendant is dangerous or gravely disabled does not necessarily mean the defendant is incompetent to stand trial." (*People v. Ford* (1997) 59 Cal. App. 4th Supp. 1, 5.) Nor does the trial court's statement that it received clearance from the jail to proceed indicate that it ever doubted defendant's competence to stand trial.

8

People v. Jones , 2012 WL 3860801, at *16.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

       The reasoning of the appellate court is difficult.  If the exam were initiated by medical personnel *sua sponte*, why was there any need to communicate a negative conclusion to the court?  The fact of receiving "clearance," as documented by the trial judge certainly connotes a request for the clearance in the first instance, e.g., a pilot requesting clearance to takeoff, a sick employee seeking clearance from medical personnel to return to a certain job.  A "clearance" given by medical personnel out of the blue is unlikely.  Nor did the trial judge in his short statement, see footnote 12 below, even give a hint that he was somewhat surprised to have received an uninvited "clearance."  This is all the more so in that this judge on a very recent occasion *had* ordered other medical personnel to give medical "clearance" for physical ailments.  See, e.g., CT 376, 394 (March 2, 2010) ("The Court directed that a jail doctor examine the defendant and report back to the Court on his condition.  Communication was received that the defendant was cleared . . . .").  The courtroom clerk had no doubt as to the reason for the clearance: "JT DAY 21—see formal m.o. [minute order] Jail Psych Rpt (Conf) delivered, verbal and specific info re def's mental state in camera….The court ruled def Jones is capable of continuing participation in this jury trial . . . ."  ECF No.15 at 34, CT 17.  Contrary to the statement of the Court of Appeal, this notation leaves little doubt as to the trial connected purpose of the psychological report.  Moreover, the sealed psychological record which was before the court on March 8, signed by the trial judge, was addressed to "Your Honor," and it had a "Court Return Date."  ECF No. 42 at 2, CT 404.

28

1    In addition, the fact that it was personally delivered speaks to court direction rather than

2    some roving examination procedure where jail personnel just happen to show up before court,

3    unannounced, to deliver confidential, mental/emotional health "clearances."  This is not to say

4    that it is impossible for jail personnel to initiate an examination—just that it is very unlikely in

5    this context.  Finally, there is absolutely no support in the record that the court was concerned

6    with whether petitioner needed to be institutionalized in a mental facility versus having to appear

7    and proceed at trial.  All documents indicate that petitioner's mental capacity to continue at trial

8    was the stated concern.

9    In any event, we do now know, unequivocally, that the trial judge *did* make the request.

10   According to jail records, i.e., the report itself from Jail Psychiatric Services, provides: "Received

11   4011 6 referral from Court # 37" [i.e., the trial court-- Department 37 of the Sacramento Superior

12   Court].  This document was evidently not part of the record before the appellate court.  But it

13   leaves no doubt that the trial judge made the referral, i.e., request or order.  ECF No. 15 at 32.

14   Respondent argues that because the document demonstrating a court request as opposed to

15   an uninvited clearance was not before the appellate court, it may not be considered pursuant to

16   Cullen v. Pinholster, 563 U.S. 170 (2011), and normally, such would be the case.  The issue

17   becomes whether to expand the record, or stay the case pending consideration of the document

18   establishing the contrary of the factual finding of the appellate court on the competency issue.

19   There is good cause to stay this action pursuant to Rhines v. Weber, 544 U.S. 269 (2005).

20   First, this is not a case where the petitioner was aware at all times about a requested psychiatric

21   referral, and the contents of the report.  Indeed, in the document itself, the psychologist noted that

22   the defendant was in the dark as to why he was even seeing this psychologist.  There is no

23   indication that the jail records report referenced above indicating a court request was ever

24   available to appellate counsel.[13]  Second, despite respondent's valiant efforts to prove otherwise,

25

26   [13] Nor does it appear that the critical document referencing the court ordered exam was available
     to appellate counsel. Counsel would certainly have referenced such a document in the briefing.

27   The report itself was not attached as an exhibit in the initial petition, but was later attached to the
     amended petition giving rise to the inference that it was only fairly, recently discovered.  In any

28   event, the state courts will be free to finally determine petitioner's diligence if they so wish.

1   there is no evidence that either petitioner or the prosecution attended the before-court *in camera*

2   meeting of the judge with the jail services administrative assistant who orally delivered the

3   findings of the psychologist.  Court clerks have a duty to note for the record in court minutes who

4   was in attendance at proceedings.  The fact that only the judge and the jail administrative assistant

5   were referenced leads to the only reasonable conclusion that no one else was present.  Moreover,

6   the trial judge's cryptic summary on the record (footnote 12) did not indicate that the "clearance"

7   he was referencing was any different in nature from the physical ailment clearance of a few days

8   before—the critical mental/emotional health aspect was not referenced such that petitioner would

9   have been on notice right away that something awry had taken place.  Thus, this is not a case

10   where a petitioner had fair, contemporaneous notice of the issue he now seeks to present, but did

11   not awake to it until sometime later.

12         Also, it seems only reasonable that the state courts should have the first attempt to equate

13   the procedures used in this case with the constitutional requirements involved in the *procedure*

14   used to determine whether one remains competent to proceed with trial, and to determine whether

15   a completely *ex parte*, non-record proceeding initiated and determined by the trial judge, and then

16   simply announced in court, satisfies those procedures.  As the state appellate court noted, its

17   statutory procedures regarding possible incompetence were designed to respond to federal

18   substantive constitutional requirements.  People v. Jones , 2012 WL 3860801, at * 14.

19         In recommending that the competence claim be exhausted in state court, including any

20   necessary evidentiary hearings on the facts, the undersigned is making no pronouncement on its

21   validity.  Further, no one doubts the constitutional mandate that a person incompetent to proceed

22   to trial may not proceed until competence is regained, if ever.  See People v. Jones at *14 (citing

23   the pertinent cases).  The issue here revolves about a trial judge making an unexplained, *sua*

24   *sponte* inquiry of medical personnel, which in the case of a pro se defendant, involves not only an

25   ability to comprehend the basics of the criminal proceeding, but also a modicum of ability to

26   participate as his own counsel.  See Indiana v. Edwards, 554 U.S. 164 (2008).[14]  And it may have

27

28   [14] The undersigned does not believe, however, that respondent's attempt to conflate the cognitive
and assistance aspects of trial competency is correct.  Nor is it correct to assert that debilitating

1   been that the trial judge in this case was not inferring a doubt about petitioner's capacity to stand

2   trial per se, but rather his capacity to conduct his own defense, a slightly different standard.  Id.  It

3   is not possible, however, to determine which of the two competency issues the trial judge may

4   have decided given the *ex parte*, unexplained nature of the trial judge's request to jail personnel

5   using an odd statute to determine such competency.[15]  Quaere, whether California's "stop the

6   trial" procedure would even apply to a competency to act as one's own counsel situation.  Such a

7   question should be answered by the California courts in the first instance.  And, it may be that the

8   California courts might desire to make a statement to their trial judges—do not perform behind-

9   the-scenes, *ex parte* investigation on matters critical to trial.

10          Finally, the undersigned again recognizes that the trial judge in this case determined that

11   petitioner had an abundance of "competence" to participate in his trial nearly six months before

12   the trial began.  But a lot can happen in six months to one's mental/emotional state, especially

13   when one is confined, and competency half a year ago does not inexorably lead to the conclusion

14   of competency a half year later.

15          The competency issue should be stayed by this court pending further exhaustion in the

16   state courts.

17   *Conclusion*

18          The undersigned therefore recommends that the first two issues be denied on their merits,

19   and then stay the case directing petitioner to exhaust his state remedies on the competency issue

20   with the new evidence he presents here.  This procedure does no violence to the usual rule that

21   mixed petitions, i.e., petitions with exhausted and unexhausted claims, should be dismissed.  The

22   Ninth Circuit has recently determined that a mixed petition need not be dismissed when

23   authorizing a Rhines stay.  Mena v. Long, __F3d__, 2016 WL 625405 (9th Cir. 2016).  Nothing

24   _____

25   "emotional" illnesses which preclude a defendant from "assisting himself" in the prosecution of a
    case are anything different from a "mental illness" when it comes to determining competency

26   especially with respect to the second factor of that analysis.  However, the undersigned makes no
    finding whether petitioner suffered from any such mental illness.

27   [15] The undersigned does not think it possible for a reasonable inference to be drawn that the judge
    was concerned with whether to give petitioner a few days off from trial in the "comfort" of a

28   mental institution pursuant to Cal. Welfare and Institutions Code 5150.

in that decision would preclude adjudicating two merits issues while they are freshly briefed, but not entering judgment thereon, prior to the granting of a stay.

    Accordingly, IT IS HEREBY RECOMMENDED:

1.  That Claims 1 and 2 herein (substitution of counsel/Faretta and compulsory process issues) be denied on their merits;

2.  No judgment be entered on Claims 1 and 2 at this time;

3.  That the case be stayed pursuant to Rhines v. Weber and petitioner be directed to commence further exhaustion proceedings within 30 days of  district judge adoption of these Findings and Recommendations.

    These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven (7) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 21, 2016

                              /s/ Gregory G. Hollows

                    UNITED STATES MAGISTRATE JUDGE